Hear ye, hear ye, hear ye. The United States Court of Appeals for the 11th Circuit is now open according to law. God save the United States in this honorable court. Good morning. We are here for oral argument in case number 24-13660. Carey Dale Grayson versus the Commissioner of the Alabama Department of Corrections et al. We have Mr. Palombi here for Mr. Grayson and Mr. Overing here for the defendants. Mr. Palombi, whenever you're ready. Thank you, your honor. Good morning, your honors, and may it please the court. The world's third intergas execution is scheduled for three days from today. It was scheduled even though the first two did not go as planned. The state's protocol, as written, is designed to suffocate a conscious individual, which violates United States Supreme Court precedent. The district court misapplied that precedent and erroneously found and erroneously found that Mr. Grayson's alternatives were not feasible. This court should vacate the district court's ruling and either enjoin Mr. Grayson's execution or remand the case for ruling on the equities. And I would like to point out, your honors, that as of the time I just finished that set, that introduction is the 40 seconds that defendants expert says that Mr. Grayson will be consciously suffocating before he is unconscious from the. From the nitrogen, however, even at that 40 seconds, that has not occurred in the previous two executions. And in fact, with Mr. Smith, it was it was deemed to be roughly several minutes and the same as Mr. Miller, which was also considered by some to be several minutes, possibly up to six. Although one witness said it was more like two. In each situation, there is conscious suffocation that occurs or the nitrogen takes enough of effect to render the prisoner unconscious. And we argue that that is violating the 8th Amendment pursuant to Bays versus Reese. In Bays, Bays did involve a three drug lethal injection protocol that had sodium thiobentol, a then a paralytic pancuronium bromide and potassium chloride. There was no dispute in that case in that protocol that if it was administered properly, the protocol would not violate the 8th Amendment. The question was, what was your lobby here? Here you have a fair number of factual findings that have all been made against you and your client. So you have, I think, a difficult hurdle to overcome when seeking to overturn the district court's denial of preliminary injunctive relief. To give you one example, the district court found that there was no substantial likelihood of conscious suffocation. So what do you do with that factual finding? Your Honor, I think that factual finding, based on the testimony of the various witnesses, is clearly erroneous. Because there is no question, Your Honor, that when the mask is put on Mr. Grayson, he will be conscious. And everybody discusses when he becomes unconscious. And in fact, the defendants put a consciousness test into this protocol. So if they are testing for consciousness, it is logical that the person, if they are testing for unconsciousness, excuse me, it's logical that the person was conscious before that. And because there is no administration of a sedative, the only question is the amount of time that the person- Let me ask you a question about that. Didn't the court also find, as a factual finding, that it was possible that Mr. Grayson could make a medical request for a sedative, separate and apart from the execution protocol, and that it was likely that the request would be granted as long as the request was made for therapeutic purposes? Yes, Your Honor. The court did find that. I think the key phrase in that is the request was made for therapeutic purposes. It's then not made on account- It's not being made because it is necessary to the protocol to keep it from violating Bayes' restriction on conscious suffocation. And, Your Honor, the practical aspect of that finding is that we would be here for every nitrogen execution, that everybody subject to a nitrogen execution would have to file the lawsuit, be authorized to make the request, and we would go through this every time. And I hear what you're saying. I mean, that's certainly a concern, but in the case of Mr. Grayson, which is the case we're looking at right now, we can't say it's clearly erroneous here, maybe we can and I'm missing it, that Mr. Grayson could receive a sedative, right? That's true, Your Honor. But I think, and with all respect, I think we still have to step back to the de novo review of the legal standard that is here, which is the Bayes' standard concerning conscious suffocation. But the district court found that there would be no conscious suffocation. For your client, for example, the district court concluded, after weighing all of the evidence, including the expert opinions, that there was no persuasive evidence of negative pulmonary edema. What do you do with that factual finding? With respect, Your Honor, I believe we're talking potentially about apples and oranges here. The pulmonary edema finding was obviously disputed by both sides, and this was what the district court referred to as the battle of the experts. They were disagreed about pulmonary edema. However, the pulmonary edema, whether how the negative pressure pulmonary edema happened, or whether it happened, is a separate issue. It could be caused by the suffocation, but it still doesn't answer the question of whether there is conscious suffocation. It just says, this is, one expert said, I saw pulmonary edema, and it means this. The other expert said, I saw pulmonary edema, and it means this. Neither side, there's no disagreement that there was pulmonary edema. It's what caused it. But I thought that the district court said, and tell me what you think of this, that the negative pulmonary, negative pressure pulmonary edema, was the cornerstone of Dr. McIllary's testimony or opinion. It was, Your Honor, and it absolutely was. But all of that, all of that follows on from the question of conscious suffocation. And while the court made a finding concerning conscious suffocation, we continue to maintain that that is an illogical finding and a clearly erroneous finding, just because of the logistics of the method of execution itself. That Mr. Graveson will be conscious when the mask is put on. Mr. Graveson will be conscious as breathing air is pumped into the mask. And Mr. Graveson will be conscious when the warden switches the input into the mask from breathing air to nitrogen. But the state's expert testified that Mr. Graveson would not suffer any physical pain from the administration of the nitrogen gas. And the district court found that expert's opinion more persuasive and more credible than that of Dr. McIllary. Why isn't that a problem for you? Dr. McIllary talked about the psychological pain. And, Your Honor, going back through the United States Supreme Court cases about method of execution, going back to Wilkerson versus Utah, they talk about pain, disgrace, and terror that that's added. And I would submit to the court that being conscious and being suffocated for a period of time constitutes terror that is super added to this protocol that does not have to be there as acknowledged by the fact that the state is willing to, if he requests it, give Mr. Graveson a sedative. In Bays, though, in the lethal injection context, the Supreme Court was talking about physical pain, the paralysis of the body, the other effects that would occur if the sedation drug wasn't administered first. Do you agree with that? To an extent, Your Honor. The quote in Bays and the particular point in Bays was that Chief Justice Roberts said that failing a proper dose of sodium thiopental that would render the prisoner unconscious, there is a substantial constitutionally unacceptable risk of suffocation from pancuronium bromide and pain from the injection of potassium chloride. He split both of those. There was a separate recognition of suffocation. And in the history of American methods of execution, there is no other method that involves suffocation, if done correctly. You say that, but although the Supreme Court has never opined on it, a number of states use the gas chamber. And Your Honor, they do. How is that not akin to suffocation? Cyanide gas, the mechanism of death for a cyanide gas execution is poison, not suffocation. It could occur- I didn't say the two were the same, but how is it not akin to suffocation? When you are breathing in poison and not dying immediately from the inhalation? It is similar, yes, Your Honor. It is similar. However, in the cyanide gas situation, cyanide gas, unlike nitrogen, is colorless, odorless. You don't know that you're breathing it you feel the effects of not having oxygen. Whereas cyanide is not an odorless, to my knowledge, is not an odorless, colorless gas. And so- Why does that matter? In terms of the effect on the person who is about to be executed, why does that matter? Why isn't the question whether or not the individual is going to suffer physical pain of a type that is prohibited by the Eighth Amendment? Well, the question, Your Honor, we believe it's physical pain or psychological pain. The word terror, as used in the older opinions, the idea that you are conscious and you are trying to breathe and you are being deprived of oxygen by the state is a conscious deprivation of oxygen and a conscious deprivation of the ability to breathe, which then causes the terror that is the super added part to this method of execution and a method and a super added part that could be easily fixed. Didn't the district court find that here any psychological pain would be no different than that experienced by any other inmate in any other execution setting? The district court did find that, Your Honor, and that is another factual finding that we argue is clearly erroneous because this does go further. Obviously, in a lethal injection execution or in an electrocution execution, there is anxiety and anxiousness and all of that before the execution starts. Here, there's more than that because of the suffocation that starts after. It's not just the anxiety of the execution itself. It is the anxiety plus the suffocation that occurs. May I finish my answer, Your Honor? Yes, of course. The suffocation that occurs after of the execution. All right, Mr. Pallabi, thank you very much. You've saved your time for rebuttal. Thank you. May it please the court. Robert Overing for the state of Alabama. Two facts resolve this appeal. One, nitrogen hypoxia causes no physical pain. Two, nitrogen hypoxia causes rapid unconsciousness. The district court found both of those facts to be well supported by the state's evidence after a two-day evidentiary hearing. In contrast, Grayson's claim was a parade of highly unlikely events, which falls well short of his burden. Under the Eighth Amendment, he must show a very likely risk of severe pain that a proven alternative would significantly reduce. He failed every element of that test. Now on appeal, Grayson has not pinpointed any clear error in the district court's findings. Grayson has not shown a likelihood of success on the which seems to be the lead and crux argument on appeal. It really is a semantic argument because, yes, nitrogen hypoxia deprives the condemned inmate of oxygen, but it is not suffocation in the lay sense, like drowning or smothering with a plastic bag or paralyzing the lungs. This is really apples and oranges, trying to use the term suffocation to evoke a sense of fear and pain that does not exist with this method for a few reasons. First, there is no physical obstruction of the airway. The body is not struggling mechanically to breathe, as in the case of strangulation, say. Second, because replacing oxygen with nitrogen in the body causes rapid unconsciousness, unlike those other methods, which can be prolonged and painful. Third, because there is a free exchange of gases, there is no buildup of CO2, which can cause hypercapnia, also called hypercarbia, which is a kind of acidic burning sensation in the lungs and in the muscles. Bayes involved a completely different mechanism, using pancuronium bromide to actually paralyze the lungs, forcing them to stop. That creates physical signs of suffocation, physical pains. Here, at most, the condemned inmate has the knowledge that he is about to suffocate, and all methods involve some knowledge of death. All methods, other than lethal injection, involve a conscious inmate. Mr. O'Reilly, let me ask you about number two, where you talked about the short period of time in which unconsciousness will result. The district court credited Dr. Antonini's testimony that under the protocol, it would occur in 10 to 40 seconds, but that was inconsistent with what was observed in the executions of Mr. Smith and Mr. Miller, isn't it? I don't believe it was inconsistent with what was observed in Miller. In Smith, the state's pinpointed as less than two minutes. Well, Rich Anderson was one of the eyewitnesses to that, and he suggested that there was a change in breathing around 50 seconds, that it appeared the breathing became more ragged, and that this could have been a sign of unconsciousness. Of course, we can't pinpoint the exact second at which the inmate becomes unconscious, but it's undisputed on this record that in Miller, it was less than two minutes and that he appeared deceased at six minutes. And in Mr. Smith's case, it also could not be pinpointed as less than several minutes. Is that correct? I believe that the testimony from the execution team captain was that Smith's oxygen levels didn't drop off for a few minutes. And the testimony, there were several eyewitnesses, from Commissioner Hamm to the captain of the team, who suggested that Smith was moving before his oxygen levels ever changed. And then suddenly, he kind of let go and exhaled, and then his levels began to drop suddenly. And so this is consistent with the state's explanation that he had been holding his breath. And after he stopped holding his breath, then the method proceeded to create unconsciousness and death very quickly. Well, given that the two prior experiences were in the neighborhood of several minutes, and the district court credited the expert as saying 10 to 40 seconds, why is that finding not clearly erroneous? Because there's a lot of other evidence in the record, Your Honor. So we have cited many studies of hypoxia using inert gases. And I think probably the best evidence for that range comes from a government document from an OSHA bulletin on safety dealing with inert gases, in which the government warns that workers using supplied air respirators can become unconscious without warning in as little as 12 seconds. And I think I heard the other side say that part of the reason this is cruel is that you might feel the effects of not breathing oxygen at some point. But there's no such thing as the effects of not breathing oxygen in this method. And we know that because it's used as a peaceful means of suicide, that people want to avoid pain, and they seek this out as a method that can avoid all pain. And second, because in the workplace, when you have people who are exposed, who hook up, for example, the mask to the wrong gas, it's supposed to be supplying room air, and instead, it gets hooked up to argon or nitrogen or helium. They don't realize that they're breathing in something other than oxygen until it's too late. There's no awareness of any kind of problem. And if there were any kind of pain or sensation of breathlessness, then you'd simply remove the mask. But people don't do that, unfortunately. And they die extremely quickly without rescue. We're unaware of any case of someone who has survived inert gas asphyxiation without being rescued by a third No, not in those terms, because as a technical matter, the method does deprive the inmate of oxygen. I'm saying that the Supreme Court in Bays, dealing with a lethal injection protocol, indicated that if the protocol somehow led to conscious suffocation, there would be an Eighth Amendment problem, right? I don't believe the Supreme Court decided that, because it was unprotected. I said the Supreme Court said that there would be an Eighth Amendment problem. That's what the three justice plurality indicated, right? There's one sentence, and it says, I'm sorry, I don't want to be technical here, but it says that there could be an Eighth Amendment problem if the sedative didn't work because of two drugs, the pancuronium bromide and the potassium chloride. I don't read it to mean that each of those drugs independently would cause an Eighth Amendment violation without a sedative, and it just wasn't litigated that way. According to that sentence, the problem is conscious suffocation, right? That was one of the problems, yes. Okay. If conscious suffocation exists, does it matter what the method of execution is? Yes, it does, Your Honor, because both Bucklew and Glossop and Bayes said that the ultimate standard for a method of execution claim is a substantial likelihood of severe pain. If you have a substantial likelihood of conscious suffocation, is there an Eighth Amendment problem? It could be part of the story, but there still has to be severe pain. So, I don't read the Supreme Court to say that any kind of conscious suffocation per se satisfies the first prong of the test. When the Supreme Court talks about pain, it is talking about a physical kind of pain, and this would be very surprising because this court heard an appeal out of the Kenneth Smith case in the Supreme Court, and no one suggested that there's a per se violation of the Constitution or even of the first prong, and that's why Kenneth Smith had to come up with this scenario about vomiting, that he would vomit into the mask and choke on his vomit and asphyxiate that way because that was at a risk of pain. A claimant has to show more, and all of these historical methods that Grayson argues are per se unconstitutional, like burning at the stake, are all methods that involve some severe pain, and then beyond that, the claimant has to show a comparison to an alternative, and that's why it can't per se satisfy that first prong because the risk has to be one that an alternative would significantly reduce. That can't be done in a vacuum. It has to be done in the context of litigation and knowing what those alternative methods are. We know that Grayson does not really believe, in this case, the way it's been litigated, that conscious suffocation is always unconstitutional because his complaint, docket entry one, had a method of a gas chamber which involved conscious suffocation, and yes, there's a sedative, but it was not part of that alternative that the inmate must be unconscious before the nitrogen gas flowed, and then also paragraph 101 of the original complaint said, assuming proper administration, if exposed to pure nitrogen gas, plaintiff would lose consciousness in a few seconds and experiencing no pain or discomfort while dying of asphyxiation in just a few minutes, and so this was an admission that there is a constitutional way to do nitrogen hypoxia well, even if there's no guarantee of unconsciousness. I'd like to discuss the alternatives a little bit, too, here, and if... Before you go to that, Mr. O'Brien, I just want to ask you, will Mr. Grayson be able to receive a therapeutic sedative immediately before the execution? Inmates can ask for a prescription out of medical necessity by the medical care provider, and some inmates do and have done that, and there's evidence that, in this record, that Mr. Grayson is on an anti-anxiety medication and has contemplated whether he needs additional anti-anxiety medication. That was something in his deposition, so this is not an unavoidable kind of harm that the state has super-added onto the method to the extent an inmate needs medical care, then the prison system has a means of providing that. But that would be therapeutic to treat a condition. The prescriber would have to make that determination. That's right. So you don't really know whether he could receive it or not. No, but if his argument is correct that it is a matter of medical necessity to avoid severe psychological pain, then it seems that he would need that. If he couldn't get a doctor to agree that he should be prescribed whatever it is, then it's hard to see how the state has to provide it as a matter of constitutional law when it's not even medically necessary. So that issue cuts both ways a little bit. On the subject of psychological pains, I think it could be relevant to an Eighth Amendment method claim, but the district court rightly found that this is a type of harm, emotional distress, that is likely to occur with any kind of method of execution. And there are no facts in the record to suggest that there is something inherently terrifying about the nitrogen hypoxia method as opposed to any other method. And the alternatives really don't significantly reduce the risk of fearing death. Even if Grayson were sedated, he could experience that same psychological pain and the same symptoms of that emotional distress prior to the administration of the sedatives. And then the alternatives raise their own problems. They're really unknown to the state how ketamine will interact with midazolam and nitrogen gas. The district court rightly found that it was speculative whether this would work or introduce other errors. For example, other risks. Intramuscular injection is not something that ADOC has experience with. It couldn't be performed by a doctor. It has a large error rate, according to Dr. Antonini and studies that he cited, because intramuscular injections have to be done very precisely to avoid injection into fat and they have to be injected into the muscle. These sedatives could backfire and cause harmful side effects like respiratory depression, which is the exact kind of risk that Grayson fears with the nitrogen protocol as it stands. There are other changes to the protocol that Grayson has proposed. For example, reducing the flow rate to five liters per minute. And there's testimony in the record that that actually could suffocate someone. A state employee tried on the mask at that rate and said there might as well not have been any air coming in. Additionally, the alternatives fail as a matter of law because they're completely untried and untested. They have no track record, no study supporting them. And while this nitrogen hypoxia is a relatively new method, the state came with a lot of evidence from the context of workplace fatalities and suicides showing this to be a reliable and humane method of death. In contrast, we don't know what the combination of these drugs will do. And Grayson's expert did not show any medical research or studies on these drugs at dosage used in combination. There was also evidence that the district court referenced that Mr. Grayson himself had at least once in the past said that he was going to refuse midazolam, right? That's right. And in, well, in the deposition in this case, just a few weeks ago, he said, I don't want that drug. That doesn't even sound like my case. And so there's some question of whether this alternative is actually advocated by the plaintiff here. Now, they've said that that was about oral midazolam and that he would, he does endorse intramuscular midazolam. And then they changed the dosage at the last minute at the evidentiary hearing. It was supposed to be 10 milligrams per kilogram, and they reduced it to 0.2 milligrams per kilogram. And so with these shifting methods, and this already was a shift from the gas chamber alternative that was first proposed a few months ago, the state has valid penological reason to reject them because they sound like experiments being made up on the fly. And the change to the method occurred after we had already deposed the expert, after he'd written his report. And so we learn at the hearing now there's a significant change in dosage. This is the kind of thing that the state has reason not to accept. And if the state has good reason not to go down that road, not to try a new method on the fly like this, then it's not acting cruelly. It cannot be said that ADOC officials are subjectively blameworthy for refusing to adopt these alternatives that look like they've been sketched on the back of an ad. A few other points on the Bayes issue. Well, you know what? I think we've addressed that issue. I may not have said that. I do believe that sentence was dicta because it was not actually litigated. It was not contested by the parties that the sedative in the lethal injection protocol had to work. Otherwise, there would be a constitutional problem. On this issue of the throat spasming, I think the district court's findings there were not clearly erroneous that this relied on a kind of cascade of speculative steps that an inmate could panic so much that right when the nitrogen flows, there happens to be a throat spasm, and then that exacerbates his panic. Again, this is painless. The expert did not say that this kind of spasm would cause any kind of severe pain. And the state had evidence from Dr. Antonini that an inmate was more likely to hyperventilate in a state of panic, that the airway would become more open and an inmate would breathe more than normal. As far as the Smith and Miller executions, the district court's final conclusion that death occurred within minutes and consciousness was rapid, was well-supported by the eyewitness testimony, by the studies, and the expert testimony. The only evidence that Grayson came with was newspaper accounts, and these were lay witnesses who were not examined, did not provide sworn testimony, and didn't know all the facts, like Kenneth Smith's pulse oximetry, which showed that he wasn't breathing in the nitrogen. They didn't know how the method was supposed to work. They didn't understand things like agonal breathing, involuntary movements that happen with death. This method does not involve a paralytic drug like in lethal injection, so some degree of movement is to be expected. And then Kenneth Smith, we showed, was resisting even before the nitrogen began to flow. So, on this record, the court needs to apply a clear air standard, which is highly deferential. The state won the battle of the experts, and the Dr. Antonini testimony was found to be more credible, and the court should defer to that finding, find that affirm. Thank you. All right, thank you very much. Mr. Palombi? Okay, Mr. Palombi, whenever you're ready for your rebuttal. I think your mute button might be on. There we go. Your honors, first spot I would like to mention is page 47 of the district court's order, which is document number 95. While the district court notes that it did not find unconstitutional concerns, it also said what the evidence did show was that the nitrogen hypoxia protocol was successful and resulted in death in less than 10 minutes and loss of consciousness in less time. And he further noted that the Miller execution evidence established that the execution that unconsciousness was reached in less than two minutes and was void of struggles against the restraints. And it mentioned that Smith's execution had some slightly more violence than the Miller execution. But in that page, he acknowledges that there was consciousness, and that unconsciousness was reached in a period of time. With respect to the Department of Corrections offering an extra therapeutic dose of a drug to Mr. Grayson, I would point out that there's a vast difference between anti-anxiety medication and sedative. And certainly, there is anxiety in leading up to an execution, but a sedative is different. And the Supreme Court talked about, in Bays, conscious suffocation. And Bays was litigated on both points. But given the factual findings made by the district court here, Mr. Palombi, this is not a conscious suffocation case, right? Yeah, we would respectfully disagree. We think this is a conscious suffocation case. And the amount of time, whether it's 40 seconds, or two minutes, or three minutes, or six minutes, is the terror that is mentioned as being violative of the Eighth Amendment in all the older cases, or extra terror. Let's turn to Dr. McElary, for example. When did he say, or opine, that unconsciousness would result? I'm not sure he actually did, Your Honor. He said it would result, but he did not specifically give a time as Dr. Antonini did. And I would point out that Dr. Antonini's time, which he gave, has never actually happened. Dr. Antonini proposed a time that has not happened in the two executions. And which leads to now, the fact that we're talking about conscious suffocation here, when there doesn't have to be, indicates that this method, as it's presently constituted, the state knows that it doesn't work the way their experts said it would, it doesn't work as quickly as their experts said it would, yet they're persistent. And offering, but yet offering the drug, which seems to imply that they know that an extra drug would assist in potentially keeping this from being conscious suffocation and violating the Constitution. All right, Mr. Pallabi, thank you very much. Mr. Overing, thank you very much as well. We'll get an opinion out as soon as possible. Court is in recess.